**CROSNER LEGAL, P.C.**
Michael T. Houchin (SBN 305541)
*mhouchin@crosnerlegal.com*
Ryan Tack-Hooper (WA SBN 6209 *pro hac vice*)
Zachary M. Crosner (SBN 272295)
*zach@crosnerlegal.com*
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429
***Attorneys for Plaintiff and the Proposed Class***

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL HERRERA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>REED'S, INC.<br><br>Defendant. | Case No. 3:26-cv-00756-RSH-JLB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND REQUEST FOR JUDICIAL NOTICE**<br><br>Date:   April 22, 2026<br><br>*No oral argument unless requested by the Court*<br><br>Complaint Filed: Feb. 06, 2026<br>Trial Date:   Not Set |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II. STATEMENT OF FACTS ................................................................................ 1

III. LEGAL STANDARD ...................................................................................... 2

IV. ARGUMENT ...................................................................................................... 3

    A.  The Complaint Plausibly and Particularly Alleges That Reed's Uses MCA. ........................................................................................... 4

    B.  The Complaint Plausibly Alleges That Labeling MCA as "Natural" Is Misleading. ........................................................... 5

        1.  Production techniques can independently render an ingredient artificial. ................................................................. 5

        2.  Plaintiff plausibly alleges that MCA contains post-fermentation recovery residues. ................................................ 7

        3.  The reasonable consumer standard does not import knowledge of obscure commercial production techniques. ........................................................................... 8

        4.  The government materials support Plaintiff, not Reed's............ 9

            a.  The USDA organic classification does not reach the questions in this case. ............................................... 10

            b.  The FDA regulations draw the line Plaintiff draws. ...... 11

    C.  Reed's Challenge to the Price-Premium Comparator Raises Factual Questions That Cannot Be Resolved on the Pleadings. ......... 12

    D.  The Claims Are Not Preempted. ......................................................... 13

    E.  Plaintiff's Allegations About His Future Intent Suffice for Injunctive Standing ........................................................................ 14

    F.  The Express Warranty Claim Survives for the Same Reasons as the Consumer Fraud Claims. ....................................................... 15

V.  CONCLUSION ................................................................................................. 16

-i-

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Albrigo v. Chobani, LLC,*
  2025 WL 1930007 (S.D. Cal. July 11, 2025) .......................................................4, 6

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).................................................................................................3

*Becerra v. Dr Pepper/Seven Up, Inc.,*
  945 F.3d 1225 (9th Cir. 2019) ................................................................................8

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).................................................................................................3

*Branca v. Bai Brands, LLC,*
  2019 WL 1082562 (S.D. Cal. Mar. 7, 2019).........................................................8

*Buksbaum v. Boar's Head Provisions Co.,*
  2026 WL 622691 (S.D. Cal. Mar. 5, 2026) .........................................................15

*Capaci v. Sports Rsch. Corp.,*
  445 F. Supp. 3d 607 (C.D. Cal. 2020) .................................................................13

*Carbine v. Target Corp.,*
  2025 WL 501829 (C.D. Cal. Feb. 13, 2025) ..........................................4, 6, 8, 11

*Davidson v. Kimberly-Clark Corp.,*
  889 F.3d 956 (9th Cir. 2018) ...............................................................................15

*Ebner v. Fresh, Inc.,*
  838 F.3d 958 (9th Cir. 2016) .................................................................................9

*Eminence Capital, LLC v. Aspeon, Inc.,*
  316 F.3d 1048 (9th Cir. 2003) .............................................................................16

*Fried v. Snapple Beverage Corp.,*
  753 F. Supp. 3d 1145 (S.D. Cal. 2024) .................................................................6

*Geier v. American Honda Motor Co.,*

-ii-

529 U.S. 861 (2000)..............................................................................................13, 14

*Ivie v. Kraft Foods Glob., Inc.*,
    2013 WL 685372 (N.D. Cal. Feb. 25, 2013) ........................................................8

*Jones v. Reed's, Inc.*
    2026 WL 622724 (N.D. Cal. Mar. 5, 2026). ........................................................4

*Karabas v. TC Heartland LLC*,
    770 F. Supp. 3d 454 (E.D.N.Y. 2025) ..........................................................6, 7, 8

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ...............................................................................3

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...............................................................................10

*Kim v. Benihana, Inc.*,
    2021 WL 1593248 (C.D. Cal. Feb. 24, 2021) ......................................................9

*Kwikset Corp. v. Superior Court*,
    51 Cal. 4th 310 (2011) .........................................................................................12

*Lockwood v. Conagra Foods, Inc.*,
    597 F. Supp. 2d 1028 (N.D. Cal. 2009)...............................................................14

*Mason v. Reed's, Inc.*,
    515 F. Supp. 3d 135, 144 (S.D.N.Y. 2021). ..............................................1, 11, 12

*McGinity v. Procter & Gamble Co.*,
    69 F.4th 1093 (9th Cir. 2023) ................................................................................9

*Moore v. Trader Joe's Co.*,
    4 F.4th 874 (9th Cir. 2021) ....................................................................................9

*Orozco v. Target Corp.*,
    2026 WL 410502 (C.D. Cal. Feb. 10, 2026) ...................................................4, 15

*Ringler v. J.M. Smucker Co.*,
    783 F. Supp. 3d 1229 (C.D. Cal. 2025).............................................................3, 4

-iii-

*Squeo v. Campbell Soup Co.*,
    2024 WL 4557680 (N.D. Cal. Oct. 22, 2024) .................................................3, 4

*Taylor v. Walmart, Inc.*,
    789 F. Supp. 3d 774 (C.D. Cal. 2025) .............................................................3, 4

*Valencia v. Snapple Beverage Corp.*
    2024 WL 1158476 (S.D.N.Y. Mar. 18, 2024)................................................6, 7, 8

*Williams v. Gerber Prods*. Co.,
    552 F.3d 934 (9th Cir. 2008) .........................................................................3, 7, 8

Statutes

7 U.S.C. § 6502(22) ...............................................................................................10

21 U.S.C. § 343(a)(1) .............................................................................................11

Cal. Com. Code § 2313 ...........................................................................................16

Regulations

7 C.F.R. § 205.605(a) .............................................................................................10

7 C.F.R. § 205.605(a)(1)................................................................................10, 11, 13

21 C.F.R. § 173.280.............................................................................................7, 11

21 C.F.R. § 173.280(d)–(e)......................................................................................2, 5

21 C.F.R. § 184.1033(a) ........................................................................................9, 11

Other Authorities

80 Fed. Reg. 69,905, 69,906 (Nov. 12, 2015) ........................................................14

-iv-

## I.   INTRODUCTION

Reed's markets its premium ginger ales as containing "Nothing Artificial" and "All Natural," yet uses manufactured citric acid produced through fermentation of *Aspergillus niger* mold followed by highly industrialized chemical recovery—instead of fruit extraction. The company seeks premium pricing without employing natural processes.

This lawsuit is not the first challenge to Reed's marketing claims in relation to citric acid. *In Mason v. Reed's Inc.,* a New York court rejected Reed's attempt to dismiss similar allegations under New York law. 515 F. Supp. 3d 135, 144 (S.D.N.Y. 2021). There, as here, Reed's did not deny using this mold-grown and chemically extracted version of citric acid.

This Court should deny the motion to dismiss like the Court in Mason, since it is even weaker under California law. California courts have consistently rejected Reed's arguments in citric acid cases, finding that allegations describing the industrial *A. niger* process and the largescale infeasibility of fruit extraction satisfy Rules 8 and 9(b). Reed's reliance on out-of-circuit cases involving different legal standards is unpersuasive given the overwhelming authority within this Circuit.

## II.   STATEMENT OF FACTS

The front labels of Reed's Real Ginger Ale and Zero Real Ginger Ale prominently declare "All Natural," and the cartons state "Nothing Artificial." Compl. ¶¶ 11–12. Reed's website echoes these claims, telling consumers the products contain "absolutely nothing artificial" and characterizing them as "handcrafted." *Id*. ¶ 2; *see* drinkreeds.com. These representations are the most prominent feature of Reed's marketing, and the products command a substantial premium based on them—nearly five times the per-ounce price of comparable ginger ale not marketed as lacking artificial ingredients. *Id*. ¶¶ 32–33.

-1-

Reed's ginger ales contain manufactured citric acid (MCA). Compl. ¶ 14. Citric acid occurs naturally in citrus fruit, but fruit extraction is not commercially available at the scale of Reed's operations. Id. ¶ 16; Ex. B. Instead, approximately 99% of the world's commercial citric acid is manufactured through fermentation of *A. niger* followed by chemical recovery using various synthetic chemicals. *Id*. ¶¶ 15–17; Ex. A.

That fermentation and chemical recovery process is described in FDA regulations and in Exhibit A to the Complaint. In sum, the process begins with highly processed glucose, derived from corn syrup, fed to a genetically engineered, gamma-radiation-mutagenized strain *of A. niger*—a black mold—in industrial bioreactors. Ex. A. The mold metabolizes the glucose into citric acid and the citric acid is then chemically recovered from the fermentation liquor. *See id*. Citric acid produced this way can contain residues of the chemicals used in the post-fermentation recovery, such as isoparaffinic petroleum hydrocarbons, as well as impurities from the *A. niger* itself. *Id*. ¶¶ 20–23; Ex. A; 21 C.F.R. § 173.280(d)–(e). Indeed, the FDA regulates this method of producing citric acid by setting maximum permissible residue levels for chemicals like n-octyl alcohol, isoparaffinic petroleum hydrocarbons, and tridodecyl amine. 21 C.F.R. § 173.280(d)–(e). This chemical engineering is predominantly performed in Chinese factories, at a scale of more than 2 million tons per year, before the refined citric acid is shipped elsewhere for inclusion in downstream products. Ex. A. For these reasons, MCA is not considered "natural." *See* Ex. A (MCA "is not the naturally occurring citric acid").

Plaintiff purchased the Products in San Diego in February 2025 after seeing and relying on the "All Natural," "Natural Ingredients," and "Nothing Artificial" statements. Compl. ¶ 34. He would not have purchased them, or would have paid less, had he known they contained MCA. *Id*. ¶ 35.

### III. LEGAL STANDARD

-2-

To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts all factual allegations as true and construes them in Plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 9(b) requires pleading that is "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong*." Kearns v. Ford Motor Co*., 567 F.3d 1120, 1124 (9th Cir. 2009).

In California consumer-labeling cases, the merits question is whether the challenged representation is "likely to deceive a reasonable consumer." *Williams v. Gerber Prods*. Co., 552 F.3d 934, 938 (9th Cir. 2008). That is "usually [] a question of fact not appropriate for decision on demurrer," with dismissal warranted only in the "rare situation" where it is "impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived." *Id*. at 938–39.

## IV.    <u>ARGUMENT</u>

The Complaint satisfies Rule 9(b) by identifying the "who, what, when, where, and how" of the alleged fraud, including specifying that Reed's uses MCA manufactured from *A. niger* fermentation and subsequently chemically recovered, and that such a manufacturing process and the resulting compound would not be considered "natural" by a reasonable consumer. Compl. ¶¶ 11–25, 34. This is more than sufficient to give Reed's notice of the particulars of Plaintiff's claim so that it can specifically address them. *See Kearns*, 567 F.3d at 1124. Every court in this Circuit to consider materially identical allegations has sustained them under Rule 9(b). *See Squeo v. Campbell Soup Co.*, No. 24-CV-02235-SVK, 2024 WL 4557680, at *4 (N.D. Cal. Oct. 22, 2024); *Taylor v. Walmart, Inc.*, 789 F. Supp. 3d 774, 785 (C.D. Cal. 2025); *Ringler v. J.M. Smucker Co.*, 783 F. Supp. 3d 1229, 1238-41 (C.D. Cal. 2025); *Albrigo v. Chobani, LLC*, No. 3:24-CV-01418-BJC-KSC, 2025 WL

-3-

1930007, at *4 (S.D. Cal. July 11, 2025); *Orozco v. Target Corp.*, No. CV 2:25-CV-07254-KS, 2026 WL 410502, at *1 (C.D. Cal. Feb. 10, 2026).

### A. The Complaint Plausibly and Particularly Alleges That Reed's Uses MCA.

The Complaint directly alleges Reed's citric acid is produced via industrial fermentation of *A. niger* and chemical recovery, as naturally extracted citric acid is not commercially available at scale. Compl. ¶¶ 14–18. *Squeo* found these facts "sufficient at the pleading stage" because it is "highly likely" the acid was artificially produced. 2024 WL 4557680, at *4. *Taylor*, 789 F. Supp. 3d at 785; *Ringler*, 783 F. Supp. 3d at 1238–39; and *Albrigo*, 2025 WL 1930007, at *6–7 are in accord.

*Jones v. Reed's* also recently followed *Squeo* and held in the analogous context of Reed's use of malic acid that allegations about Reed's production processes—coupled with commercial infeasibility of alternatives—satisfied Rules 8 and 9(b). No. 25-CV-07102-JCS, 2026 WL 622724, at *9-10 (N.D. Cal. Mar. 5, 2026). The same logic, applied to the same defendant, requires the same result here.

Reed's suggests that supplier records and laboratory analysis of the particular citric acid it uses as an input are necessary for a consumer to meet Rule 9(b). But that information is exclusively within Reed's own possession. Courts have rightly rejected that misreading of the purpose of Rule 9(b). *Carbine* held that "[t]here is no magic source of information to which Plaintiff needs access" to plead these claims "so long as the allegations on the whole meet the plausibility standard." *Carbine v. Target Corp.,* No. CV 24-03721-MWF (AJRx), 2025 WL 501829, at *3 (C.D. Cal. Feb. 13, 2025). Reed's demand for deep supplier investigation before a lawsuit is even filed conflates the burden of proof at trial with the burden of pleading.

Notably, in addition to the industry-based allegations that have uniformly been held sufficient in this Circuit, Reed's has been sued on this precise theory before and has never denied using citric acid produced by microbial fermentation

-4-

*Herrera. v. Reed's Inc.* Case No. 3:26-cv-00756-RSH-JLB
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND REQUEST FOR JUDICIAL NOTICE

and subsequent recovery using synthetic chemicals. Compl. ¶ 18. Reed's has never offered some other production method—even as a hypothetical in an attempt to defeat plausibility—that it or its suppliers might use. A defendant that used fruit-extracted citric acid, or some materially different production method, would have said so by now.

**B.** **The Complaint Plausibly Alleges That Labeling MCA as "Natural" Is Misleading.**

The Complaint alleges that labeling MCA-containing products "All Natural" misleads reasonable consumers because of the highly industrialized and artificial production process and the presence of post-fermentation residues from *A. niger* and chemicals used in acid recovery. Compl. ¶¶ 15–35. Both bases—the nature of the production and the presence of residues—are independently sufficient, where as here there is no reason to think consumers of ginger ale are familiar with largescale citric acid production and when the FDA's own regulations treat this kind of MCA as a separate category from naturally occurring citric acid.

**1.** **Production techniques can independently render an ingredient artificial.**

The production process by which an ingredient is made can render it "artificial" in the eyes of a reasonable consumer—regardless of whether the finished molecule is chemically similar to its natural counterpart. Compl. ¶¶ 15, 17, 31, 35. A consumer who reads "All Natural" on a beverage label does not picture a multi-stage industrial process in which specially engineered and genetically modified mold is fermented in steel bioreactors and then subjected to chemical recovery using compounds like n-octyl alcohol and synthetic petroleum hydrocarbons. Compl. ¶¶ 15–35, Ex. A; 21 C.F.R. § 173.280(d)–(e). The reasonable consumer pictures fruit. The gulf between those two images is the deception, and it does not close because chemists can show the molecule emerging from a bioreactor has the same formula

-5-

as the one inside an orange. "Natural" is a representation about provenance and process, not just chemistry.

Courts applying California law have accepted that production techniques can render a product artificial. In *Albrigo*, Judge Cheeks held that allegations describing "transformative manufacturing processes" for stevia and monk fruit extracts sufficed to state a claim that "Only Natural Ingredients" labeling was misleading, and that whether a reasonable consumer would view those processes as consistent with "all natural" claims was "a question better suited for a later stage in the proceedings, after discovery has been completed." 2025 WL 1930007, at *4–6. In *Carbine*, Judge Fitzgerald specifically credited allegations about the process by which *A. niger* is fermented and citric acid is chemically extracted as evidence "tend[ing] to establish that a reasonable consumer would find manufactured citric acid 'artificial.'" 2025 WL 501829, at *3; *see also Fried v. Snapple Beverage Corp.*, 753 F. Supp. 3d 1145, 1153 (S.D. Cal. 2024) (holding that reasonable consumers "could not know that the 'citric acid' listed among the ingredients was an artificial, industrially-manufactured chemical," especially because citric acid occurs naturally in fruits as well).

Reed's relies on *Karabas* and *Valencia* for the categorical proposition that production process alone cannot render a naturally occurring chemical artificial. *See Karabas v. TC Heartland LLC*, 770 F. Supp. 3d 454 (E.D.N.Y. 2025); *Valencia v. Snapple Beverage Corp.*, No. 23-CV-1399 (CS), 2024 WL 1158476 (S.D.N.Y. Mar. 18, 2024). As noted below, both cases are distinguishable because of Plaintiff's residue allegations, but additionally both are unpersuasive on the processing point because they reach their conclusions about whether production process alone can render an ingredient artificial through doctrinal moves California law does not permit at the pleading stage.

Specifically, both courts resolved an empirical question about consumer perception as if it were a question of law. Whether a reasonable consumer would

-6-

regard industrially fermented, chemically-recovered citric acid as inconsistent with "All Natural" labeling is a factual question. *Karabas* answered it by announcing that "[n]o reasonable consumer would conclude that a product contains artificial ingredients merely because it is produced 'in industrial factories' using 'synthetic processes.'" 770 F. Supp. 3d at 467. *Valencia* declared that "[a] reasonable consumer would not think that a compound found in nature is artificial even if it is produced in a different way than nature produces it." 2024 WL 1158476, at *6. Neither court cited survey evidence; neither credited the plaintiff's contrary allegations about consumer understanding; neither explained why its own intuition should override those well-pleaded allegations. That is the mode of decision *Williams* says should be avoided unless the deception is effectively "impossible." 552 F.3d at 938–39.

The mode of production of a product—highly industrialized vs. similar to how it has been done for centuries—carries social and environmental consequences, or health consequences not yet identified, that a reasonable consumer who prefers natural products might care about. The relevant question for MCA is whether the multi-stage chemical processing necessary to recover and refine it from *A. niger* produces something a reasonable consumer would still describe as artificial, which is a question this Court cannot answer on the pleadings.

### 2.  Plaintiff plausibly alleges that MCA contains post-fermentation recovery residues.

The Complaint also alleges that MCA may contain residues of synthetic chemicals used in its recovery and impurities from *A. niger* itself. Compl. ¶¶ 20–22; Ex. A. That allegation is supported by the FDA's residue regulations, 21 C.F.R. § 173.280, which set permissible limits for synthetic chemicals used in citric acid recovery. This too is enough for a reasonable consumer to conclude the product is different from natural citric acid.

Reed's responds that natural citric acid and MCA are chemically identical.

-7-

But that is a quintessential factual dispute that cannot be resolved on the pleadings. *Carbine* held that whether a reasonable consumer would view MCA and natural citric acid as interchangeable is "a fact-intensive determination" that "the Court cannot, at this motion-to-dismiss stage," make. 2025 WL 501829, at *5; *see also Branca v. Bai Brands, LLC*, 2019 WL 1082562, at *8 (S.D. Cal. Mar. 7, 2019) (factual questions about ingredient characterization are "inappropriate for determination on a motion to dismiss") (quoting *Ivie v. Kraft Foods Glob., Inc.*, No. C-12-02554-RMW, 2013 WL 685372, at *4 (N.D. Cal. Feb. 25, 2013)).

Plaintiff's allegations concerning the residues introduced by mold fermentation and chemical post-processing further distinguish this case from the out-of-Circuit decisions Reed's relies on. *Karabas*, which involved stevia and erythritol, expressly rested on the absence of any allegation that "the chemicals used in production end up in the product itself." 770 F. Supp. 3d at 467. *Valencia* similarly dismissed because the plaintiff "d[id] not allege that the resulting citric acid contains synthetic agents." 2024 WL 1158476, at *6. Plaintiff alleges what those plaintiffs did not.

### 3. The reasonable consumer standard does not import knowledge of obscure commercial production techniques.

Reed's invokes a narrow exception to the rule from *Williams* that whether a reasonable consumer is deceived is usually "a question of fact not appropriate for decision on demurrer," *Id.* at 938–39, contending that this is a case in which the alleged deception depends on consumers holding a belief that ordinary marketplace knowledge plainly contradicts. *See Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228–29 (9th Cir. 2019) (no reasonable consumer would interpret "Diet" as a promise of weight loss).

Several features distinguish the *Becerra* line of cases from Reed's invocation of it. Each of those cases turned on information a reasonable consumer *of that*

-8-

*product* would already know or could readily grasp without specialized expertise: that diet sodas are about calorie content (*Becerra*), or that manuka honey cannot plausibly be made entirely from one type of pollen. *See Moore v. Trader Joe's Co.*, 4 F.4th 874, 881–85 (9th Cir. 2021). In *Moore*, moreover, the plaintiffs' interpretation was contradicted by signals on the label itself: a "10+" UMF rating that any manuka buyer would recognize as denoting low purity, and a $13.99 price point set against $266 per jar for higher-purity manuka. *Id.* at 884–85. Second, several of these cases involved deceptions the consumer could investigate at the point of purchase simply by looking. *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 965–66 (9th Cir. 2016) (lip-product purchaser could see the dispenser mechanism through the packaging); *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097–98 (9th Cir. 2023) ("Nature Fusion" front label was ambiguous and clarified by the back label).

By contrast, there is no reason to think any consumer outside employees of the food industry knows that—while it is biologically and physically possible at small scales to use fruit-based citric acid (see 21 C.F.R. § 184.1033(a))—the citric acid in mass-market food is produced by feeding carbohydrates to black mold and then recovering the result with various synthetic chemicals. Nothing on a Reed's can or carton signals which form of citric acid Reed's uses. The *Becerra* line does not stand for the proposition that consumers of ordinary products like ginger ale are charged with knowing obscure commercial production techniques of a non-primary ingredient in the product. A reasonable consumer is not "versed in the art of inspecting and judging a product, [or] in the process of its preparation or manufacture." *Kim v. Benihana, Inc.*, No. 519CV02196JWHKKX, 2021 WL 1593248, at *3 (C.D. Cal. Feb. 24, 2021) (internal citations and quotations omitted).

### 4.    The government materials support Plaintiff, not Reed's.

Reed's asks the Court to take judicial notice of various federal agency

-9-

materials, including NOP 5033-1, 7 C.F.R. § 205.605(a), and FDA's 2015 Federal Register notice, and to read those materials as foreclosing Plaintiff's theory. [1]Plaintiff does not object to notice of the documents, so long as they are not used to dispute well-pleaded factual allegations or for the truth of disputed propositions contained in them. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999-1000 (9th Cir. 2018). Setting aside any disputed fact claims within them, the materials show that the USDA classification Reed's invokes is a term of art internal to the organic scheme that says nothing about consumer-facing "natural" labeling or the particular reasons Plaintiff alleges that MCA is artificial. And the FDA regulations draw exactly the line Plaintiff draws between naturally occurring citric acid and the MCA at issue here.

### a. The USDA organic classification does not reach the questions in this case.

The Organic Foods Production Act defines "synthetic" to exclude "substances created by naturally occurring biological processes," 7 U.S.C. § 6502(22), and since USDA treats fermentation as such a process, it therefore classifies citric acid produced from fermenting mold as "nonsynthetic" for purposes of deciding what inputs may be used in products bearing the federal "organic" label. 7 C.F.R. § 205.605(a)(1); NOP 5033-1 § 4.7 (Dec. 2, 2016). USDA's classification does two things, and only two things: it identifies fermentation as a "naturally occurring biological process," and it permits the resulting ingredient as an input in organic-labeled products.

USDA's classification does not do the work Reed's needs it to do. Section

---

[1] Reed's also asks for notice of seven additional purported exhibits but exhibits 4-10 were never filed and largely consist of judicial materials for which notice is not ordinarily required. Based on the motion content, Plaintiff understands this to be an error in the Request for Judicial Notice rather than a filing error.

-10-

205.605(a)(1) is not a finding that the entire industrial process from glucose feedstock through chemical recovery yields a substance that reasonable consumers would call "natural." It is also not a finding that no residues are introduced by synthetic processing chemicals or retained by *A. niger* post-fermentation. Those are the twin reasons Plaintiff contends MCA is artificial, and the USDA's designation and the logic that compelled it simply does not address them.

Courts addressing this exact argument about the import of the USDA classification have rejected it. *Mason* refused to treat USDA's organic guidance as foreclosing a "natural" labeling claim against this same defendant based on the same allegations. 515 F. Supp. 3d at 145. *Carbine* also directly addressed and rejected the same USDA argument Reed's makes here, holding that just because citric acid can be natural in some circumstances—such as when extracted from fruit or when there is minimal industrial post-processing—does not mean it is considered natural in the circumstances the plaintiff pleads concerning both fermentation and chemical recovery stages. *See* 2025 WL 501829, at *4.

### b.      The FDA regulations draw the line Plaintiff draws.

The agency that actually regulates the accuracy of food labeling under 21 U.S.C. § 343(a)(1) is FDA, not USDA. And FDA's treatment of citric acid undermines rather than supports Reed's position.

21 C.F.R. § 184.1033(a) defines citric acid as "a naturally occurring constituent of plant and animal tissues" and notes that it "may be produced by recovery from sources such as lemon or pineapple juice." It then observes that it may be produced "by the solvent extraction process described in § 173.280 of this chapter for the recovery of citric acid from *Aspergillus niger* fermentation liquor." 21 C.F.R. § 173.280, in turn, describes and regulates industrial citric acid recovered from *A. niger* fermentation. It imposes maximum residue limits for n-octyl alcohol, isoparaffinic petroleum hydrocarbons, tridodecyl amine, and other synthetic

-11-

*Herrera. v. Reed's Inc.* Case No. 3:26-cv-00756-RSH-JLB
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND REQUEST FOR JUDICIAL NOTICE

chemicals used in the recovery process.

FDA, in other words, regulates fruit-derived citric acid and MCA differently, acknowledging that the latter carries residues of synthetic processing chemicals significant enough to require federally-imposed tolerances. That is precisely the distinction Plaintiff draws in the Complaint, and it is grounded in the FDA regulations themselves.

Moreover, FDA has issued warning letters concluding that "the addition of . . . citric acid to these products preclude[s] use of the term 'natural' to describe th[e] product." Compl. Exs. C, D. *Mason* correctly held that while the FDA's enforcement actions do not control the question of a reasonable consumer's views of Reed's labeling claims, "the FDA material, at minimum, makes the plaintiff's allegations plausible rather than merely possible." 515 F. Supp. 3d at 144.

### C.    Reed's Challenge to the Price-Premium Comparator Raises Factual Questions That Cannot Be Resolved on the Pleadings.

Reed's separately attacks paragraph 33 of the Complaint, arguing that the Canada Dry comparator is not "plausibly comparable" to Reed's premium ginger ales because of differences in formulation, brand positioning, and packaging.

The argument fails at its premise because Plaintiff is not required to plead a comparator at all under California law; the economic-injury and causation element of the UCL and CLRA does not depend on identifying a counterfactual product. It can be satisfied by the allegation that the misrepresentation induced the purchase. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 330 (2011), holds that a plaintiff who alleges he "would not have bought the product but for the misrepresentation . . . has lost money or property within the meaning of [the UCL] and has standing to sue." Here, Plaintiff alleges that he "would not have purchased the Products, or would have paid less, had he known they contained" MCA. Compl. ¶ 35. That

-12-

satisfies the injury inquiry for pleading purposes. *See Capaci v. Sports Rsch. Corp.*, 445 F. Supp. 3d 607, 626 (C.D. Cal. 2020) (holding that sufficiency of one injury theory is enough for adequacy of pleading).

Of course, Plaintiff does also intend to prove at class certification and trial that the damages can be measured by expert analysis of the price differential. But isolating the portion of any price differential attributable to the challenged labeling claims, as opposed to other product differences, is a question appropriately reserved for class certification and trial with the benefit of fact-finding and expert testimony—not resolved as a matter of law at the pleading stage.

### D.    The Claims Are Not Preempted.

Reed's briefly raises, as an alternative, an implied preemption argument based on USDA's classification of microbially fermented citric acid as "nonsynthetic" in the organic-labeling context and FDA's lack of a formal definition of "natural." Neither supports preemption.

Implied preemption in this context arises from the federal government making a regulatory judgment that authorizes the conduct that state law would frustrate. *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000). For example, *Geier* involved a federal regulation that gave manufacturers a deliberate choice among passive-restraint options, and the state tort claim would have eliminated that choice. *Id.* at 875. There is no comparable federal policy in this case. 7 C.F.R. § 205.605(a)(1) permits microbially fermented citric acid as an input in products bearing the federal organic label—a label Reed's does not use—and says nothing about whether a product containing MCA may be marketed as "All Natural" or "Nothing Artificial." As shown in Section IV.B.4, the USDA classification also does not address the aspects of MCA production Plaintiff alleges render it artificial, including post-fermentation processing and residues from *A. niger* and recovery

-13-

chemicals. A classification that does not authorize the challenged conduct cannot be obstructed by a state-law claim challenging it.

FDA's lack of agency action to define "natural" provides even less support for preemption. FDA's decision not to regulate "natural" labeling is "an intent *not* to occupy the field" and to permit varying state regulation. *See Lockwood v. Conagra Foods, Inc.*, 597 F. Supp. 2d 1028, 1033 (N.D. Cal. 2009). The 2015 Federal Register notice on which Reed's relies is not a regulation bearing the force of law. On the contrary, it is a solicitation for comment on whether the FDA should adopt the kind of policy that could eventually have preemptive effect, something it has not chosen to do. *See* 80 Fed. Reg. 69,905, 69,906 (Nov. 12, 2015). The notice asks the questions at issue in this case—whether some manufacturing processes should disqualify a food from bearing the "natural" label and whether "the manner in which an ingredient is produced or sourced" should affect labeling. *Id.* at 69,908–09. FDA is asking those questions, not answering them. The FDA has not committed to a binding policy of protecting manufacturer choice about "All Natural" labeling the way federal regulation of passive restraints did in *Geier*. A state-law claim concerning an active and longstanding area of labeling litigation that the federal government has chosen not to regulate cannot stand as an obstacle to anything. Reed's preemption theory would invert the doctrine, converting agency silence into agency authorization. That is not the law.

### E.    Plaintiff's Allegations About His Future Intent Suffice for Injunctive Standing

Reed's contends that the Complaint fails to allege a "concrete real-world threat" sufficient for Article III standing for injunctive relief. The Ninth Circuit resolved this question in Plaintiff's favor in *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018). Reversing a dismissal for lack of standing, *Davidson* held

-14-

that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase." *Id.* at 969. "Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." *Id. Davidson* identified two alternative routes to standing: the consumer's allegation that she "will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to," or that she "might purchase the product in the future . . . as she may reasonably, but incorrectly, assume the product was improved." *Id.* at 969–70.

Plaintiff's allegations track *Davidson*'s first route. The Complaint alleges that Plaintiff "wishes to rely on Reed's labeling in the future but cannot do so unless Defendant stops this deceptive practice," and that he "faces an ongoing risk of future harm each time he encounters the Products for sale." Compl. ¶¶ 36–37. Reed's calls these allegations insufficiently fulsome, but it is unclear what else a consumer in Plaintiff's position could plausibly allege about his desire to rely on Reed's labeling going forward. Apart from any damages he may win for the class, Plaintiff wants to know if going forward Reed's products still contain MCA so he knows whether or not to buy them, a problem accurate labeling would help to solve. Nothing more is required. District courts in this Circuit have routinely sustained comparable allegations under *Davidson*, including this Court. *See Buksbaum v. Boar's Head Provisions Co.*, 2026 WL 622691, at *4 (S.D. Cal. Mar. 5, 2026) (Huie, J.) (sustaining injunctive standing under *Davidson* where plaintiffs alleged they would purchase the products again if they could rely on defendant's representations); *see also Orozco*, 2026 WL 410502, at *7 (rejecting same argument Reed's makes here in "no artificial preservatives" action involving citric acid).

**F.     The Express Warranty Claim Survives for the Same Reasons as the**

-15-

**Consumer Fraud Claims.**

The "All Natural" and "Nothing Artificial" statements are affirmations of fact that became part of the basis of the bargain when Plaintiff purchased the Products in reliance on them. Compl. ¶¶ 11–12, 34; Cal. Com. Code § 2313. Plaintiff has plausibly alleged that the Products did not conform to those affirmations because they contain MCA. *See* Sections IV.A–B, *supra*. That is all California law requires at the pleading stage. Reed's argument that the warranty claim fails for lack of nonconformity is entirely derivative; it offers no independent basis for dismissal. Because the deception theory survives, so does the warranty claim.

Reed's also briefly suggests the Complaint fails to plead reliance. That is incorrect. The Complaint alleges that Plaintiff "saw and relied on the 'All Natural,' 'Natural Ingredients,' and 'Nothing Artificial' statements on the can and carton" before purchasing the Products in February 2025, and that he "would not have purchased the Products, or would have paid less, had he known they contained MCA." Compl. ¶¶ 34–35. Those allegations satisfy the reliance element for all claims.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Reed's motion to dismiss in its entirety. If the Court finds any deficiency, Plaintiff requests leave to amend. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Dated: April 8, 2026                      CROSNER LEGAL, P.C.

By:        */s/ Ryan Tack-Hooper*

Ryan Tack-Hooper
92 Lenora St Ste 179
Seattle, WA 98121-2108
Tel: (866) 276-7637

-16-

Fax: (310) 510-6429
ryan@crosnerlegal.com
*Attorneys for Plaintiff and the Proposed Class*

*Herrera. v. Reed's Inc.* Case No. 3:26-cv-00756-RSH-JLB

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND REQUEST FOR JUDICIAL NOTICE